DOUGLAS CARSTEN, State Bar No. 198467
(dcarsten@wsgr.com)
NATHANIEL R. SCHARN, State Bar No. 305836
(nscharn@wsgr.com)
WILSON SONSINI GOODRICH & ROSATI P.C.
12235 El Camino Real, Suite 200
San Diego, California 92130
Telephone: 858.350.2300
Fax: 858.350.2399

RYAN SMITH, State Bar No. 229323
(rsmith@wsgr.com)
CHRISTOPHER D. MAYS, State Bar No. 266510
(cmays@wsgr.com)
WILSON SONSINI GOODRICH & ROSATI P.C.
650 Page Mill Road
Palo Alto, CA 94304
Telephone: 650.493.9300
Fax: 650.493.6811

Attorneys for Plaintiff IPS Group, Inc.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SAN DIEGO DIVISION

| | |
|---|---|
| IPS GROUP, INC., a Pennsylvania corporation, <br><br> Plaintiff, <br><br> v. <br><br> CIVICSMART, INC., a Delaware corporation, DUNCAN PARKING TECHNOLOGIES, INC., a Delaware corporation, and DUNCAN SOLUTIONS, INC., a California corporation, <br><br> Defendants. | CASE NO. 3:17-cv-00632-CAB (MDD) <br><br> **FIRST AMENDED COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff IPS Group, Inc. ("IPS Group") alleges as follows:

**THE PARTIES**

1.      Plaintiff IPS Group is a Pennsylvania corporation with its principal place of business and corporate headquarters at 7737 Kenamar Ct., San Diego, California 92121.

2.      Upon information and belief, Defendant CivicSmart, Inc. ("CivicSmart") is a Delaware corporation having a principal place of business at 316 N. Milwaukee Street, Suite 202, Milwaukee, Wisconsin 53202.

3.      Upon information and belief, Defendant Duncan Parking Technologies, Inc. ("DPT") is a Delaware corporation having a principal place of business at 316 N. Milwaukee Street, Suite 202, Milwaukee, Wisconsin 53202.

4.      Upon information and belief, Defendant Duncan Solutions, Inc. ("DSI") is a California corporation having a principal place of business at 633 West Wisconsin Avenue, Suite 1600, Milwaukee, Wisconsin 53203.

5.      Upon information and belief, prior to August 2015, DSI and DPT operated as alter egos of one another.  Specifically, on information and belief, prior to August 2015 DSI controlled DPT to such a degree as to render DPT merely an instrumentality of DSI.  *See* Ex. 7 (Duncan Parking's February 7, 2014 Response to Worcester, MA's Request for Proposal) at Page 86 ("This response is presented by Duncan Parking Technologies, Inc., a wholly-owned and controlled subsidiary of Duncan Solutions, Inc.  For simplicity, we routinely refer to our company as

'Duncan Solutions' or 'Duncan.'").  DSI and DPT acted as a single entity with the shared purpose of selling infringing meters, and even encouraged potential customers to disregard their separate corporate identities.  *See id.*  In some instances, DSI held itself out as though it were the entity selling Liberty Meter, even though—if the parties observed their separate corporate forms—DPT would have been the entity selling the Liberty Meter.  On information and belief, in submitting bids and providing services related to infringing meters, DSI and DPT personnel worked together as though they were a single entity, commingling funds and assets—including both personnel and other tangible assets such as machinery, design plans, and software—with the shared goal of making, using, selling, and offering to sell a single infringing product, the Liberty Meter.  Because of this unity of interest between DSI and DPT prior to August 2015, it would be an inequitable result if DPT and DSI were treated as separate corporations.  In particular, for sales of the Liberty Meter before August 2015, it would be difficult or impossible to apportion liability to one entity or the other because DSI and DPT acted as a single enterprise in making, using, selling, and offering to sell a single infringing product, the Liberty Meter.

6.     Upon information and belief, since August 2015, DPT and CivicSmart have operated as alter egos of one another.  Specifically, on information and belief, after August 2015 CivicSmart controlled DPT to such a degree as to render DPT merely an instrumentality of CivicSmart.  For example, since August 2015, DPT

1    and CivicSmart have shared the same office locations and shared overlapping

2    officers.  Also, on information and belief, DPT is a wholly-owned subsidiary of

3    CivicSmart.  On information and belief, in submitting bids and providing services

4    related to infringing meters, CivicSmart and DPT personnel worked together as

5    though they were a single entity, commingling funds and assets—including both

6    personnel and other tangible assets such as machinery, design plans, and

7    software—with the shared goal of making, using, selling, and offering to sell a

8    single infringing product, the Liberty Meter.  Because of this unity of interest

9    between DPT and CivicSmart after August 2015, it would be an inequitable result

10   if DPT and CivicSmart were treated as separate corporations.  In particular, for

11   sales of the Liberty Meter before August 2015, it would be difficult or impossible

12   to apportion liability to one entity or the other because CivicSmart and DPT acted

13   as a single enterprise in making, using, selling, and offering to sell a single

14   infringing product, the Liberty Meter.

15                      **JURISDICTION AND VENUE**

16          7.      This is an action for, *inter alia*, patent infringement.  This Court has

17   subject matter jurisdiction over such claims pursuant to 28 U.S.C. §§ 1331 and

18   1338(a), because this action involves a claim arising under the patent laws of the

19   United States, 35 U.S.C. §§ 101, *et seq.*

20          8.      This Court may exercise personal jurisdiction over DSI because DSI

21   has continuous and systematic contacts with the State of California and, on

FIRST AMENDED COMPLAINT            -3-            Case No.: 3:17CV0632-CAB (MDD)

1   information and belief, conducts regular business in this District.  For example, on

2   information and belief DSI is incorporated in California.

3         9.    This Court may exercise personal jurisdiction over DPT because DPT

4   has continuous and systematic contacts with the State of California and, on

5   information and belief, does business in this District.  Upon information and belief,

6   DPT is registered to do business in California, with its agent located at 2710

7   Gateway Oaks Dr., Suite 150N, Sacramento, California 95833, and, on information

8   and belief, regularly conducts business within California by offering for sale and

9   selling products and systems within California.  Also, during the time period for

10  which IPS Group alleges that DPT willfully infringed IPS Group's patents, DPT

11  maintains or did maintain a place of business within this District located at 5924

12  Balfour Court #102 Carlsbad, California 92008.   Moreover, at one time DPT was

13  a wholly-owned subsidiary of, and acted on behalf of, DSI (on information and

14  belief, a California corporation).  Likewise, DPT has purposefully directed its

15  infringing activities into California and this District; for example, DPT has made,

16  used, sold, offered for sale, or imported in California (and, on information and

17  belief, in this District) the products that are the subject of IPS Group's claims.

18        10.    This Court may exercise personal jurisdiction over CivicSmart at least

19  because CivicSmart has continuous and systematic contacts within the State of

20  California by, among other things, conducting regular business in California.

21  Likewise, CivicSmart purposefully directed its infringing activities into California

1    and this District; for example, on information and belief CivicSmart has made,

2    used, sold, offered for sale, or imported in California (and this District) the

3    products that are the subject of IPS Group's claims. On information and belief,

4    during the time period for which IPS Group alleges that CivicSmart willfully

5    infringed IPS Group's patents, CivicSmart—through its alter ego DPT—

6    maintained or maintains a regular and established place of business in this District,

7    such as at 5924 Balfour Court #102 Carlsbad, California 92008.

8        11.    Venue is proper in this judicial district pursuant to 28 U.S.C. §

9    1400(b) because each defendant resides here or has committed acts of infringement

10   and has a regular and established place of business here.  For example, on

11   information and belief DSI is incorporated in California.  Likewise, on information

12   and belief, during the period of infringement DPT and CivicSmart committed acts

13   of infringement in this district and maintained a regular and established place of

14   business in Carlsbad, CA as alleged above.

15       12.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§

16   1391(b), (c) and/or (d) because, *inter alia*, each Defendant is subject to personal

17   jurisdiction in this District, Plaintiff IPS Group is headquartered in this District,

18   and key witnesses reside in this District.  Likewise, given that IPS Group is

19   headquartered in San Diego, California, this District and the State of California

20   have a sufficient interest in resolving this dispute.

21

# FACTUAL BACKGROUND

## A.    IPS Group and Its Patented Technology

13.    San Diego-based IPS Group is a design, engineering, and manufacturing company focused on low power wireless communications and parking technologies.  IPS Group manufactures locally and has been delivering world-class solutions to the telecommunications and parking industries for over 19 years.  The company is best known for its patented credit card enabled, solar powered single-space parking meter and web-based management system.

14.    In the mid-2000s, IPS Group invented a revolutionary type of single-space electronic parking meter that (a) permits payment by cash or credit card, (b) is wireless, and (c) is solar-powered.  IPS Group and its technology have fundamentally altered the field of parking meters, which, prior to IPS Group's invention, lacked a commercially viable single-space option with credit card payment.  IPS Group's technology was even presented in an episode of The History Channel's show "Modern Marvels."[1]  IPS Group has also received over a dozen patents on its parking meters and related technology.

15.    IPS Group has also received significant industry praise for its patented technology.  For example, IPS Group and its technology were awarded the Australia Design Award 2009, the Tech American Green Technology Award (San

---

[1] "Coin Operated," Original air date July 24, 2008.  Full episode available at http://www.history.com/shows/modern-marvels/season-14/episode-22.

1  Diego chapter), and the United States Conference of Mayors Award of Excellence

2  in 2012.

3      16.    IPS Group's patented technology has revolutionized the industry of

4  single-space parking meters.  IPS Group's first commercial sale of products

5  embodying its patented technology occurred in 2008.  Since that time, IPS Group

6  has sold over 250,000 meters incorporating its patented technology throughout the

7  United States.  IPS Group's patented meters can also be found throughout North

8  America, including both Canada and Mexico.

9      17.    The enormous success that IPS Group has enjoyed through its

10 patented technology comes because its meters successfully combine critical

11 elements such as (a) the ability to purchase parking meter time via coin, credit

12 card, and other non-cash means (such as pay-by-phone or payment via an

13 electronic purse), (b) efficient power management using solar panels, and (c) a

14 housing designed to be retrofitted into municipalities' existing single-space meter

15 housing infrastructure.

16     18.    Municipalities switching to IPS Group's patented technology have

17 reported increased revenues, reduced citizen complaints, and fewer contested ticket

18 citations.  For example, after switching to IPS Group's patented technology,

19 Denver saw a surprising increase in parking meter revenue of more than $1.5

20 million annually.  The City of Los Angeles reported an annual net increase of $3

21 million after switching to IPS Group's patented meters.

1

**B.     The Patents-in-Suit**

2      19.     On December 21, 2010, the United States Patent & Trademark Office

3  ("PTO") duly and lawfully issued U.S. Patent No. 7,854,310, entitled "Parking

4  Meter" ("the '310 Patent").  IPS Group is the sole owner by assignment of the '310

5  Patent, a copy of which is attached hereto as **Exhibit 1**.

6      20.     On August 20, 2013, the PTO duly and lawfully issued U.S. Patent

7  No. 8,513,832, entitled "Power Supply Unit" ("the '832 Patent").  IPS Group is the

8  sole owner by assignment of the '832 Patent, a copy of which is attached hereto as

9  **Exhibit 2**.

10      21.     On November 26, 2013, the PTO duly and lawfully issued U.S. Patent

11  No. 8,595,054, entitled "Parking Meter and a Device Therefor" ("the '054

12  Patent").  IPS Group is the sole owner by assignment of the ' 054 Patent, a copy

13  of which is attached hereto as **Exhibit 3**.

14      22.     On June 10, 2014, the PTO duly and lawfully issued U.S. Patent No.

15  8,749,403, entitled "Parking Meter Communications for Remote Payment with

16  Updated Display" ("the '403 Patent").  IPS Group is the sole owner by assignment

17  of the '403 Patent, a copy of which is attached hereto as **Exhibit 4**.

18      23.     On July 12, 2016, the PTO duly and lawfully issued U.S. Patent No.

19  9,391,474, entitled "Power Supply Unit" ("the '474 Patent").  IPS Group is the sole

20  owner by assignment of the '474 Patent, a copy of which is attached hereto as

21  **Exhibit 5**.

24.     On August 23, 2016, the PTO duly and lawfully issued U.S. Patent No. 9,424,691, entitled "Parking Meter Communications for Remote Payment with Updated Display" ("the '691 Patent").  IPS Group is the sole owner by assignment of the '691 Patent, a copy of which is attached hereto as **Exhibit 6**.

25.     IPS Group marks its products with the above patent numbers in accordance with 35 U.S.C. §287(a).

**C.     The Defendants' Infringement of IPS Group's Patents**

26.     Each Defendant respectively makes, uses, sells, offers to sell, and/or imports a product known as the Liberty Meter.  On information and belief the Liberty Meter first entered the market in 2012, years after the priority date for each Patent-in-Suit.  The Liberty Meter and its use infringe one or more claims from each Patent-in-Suit.  Consequently, any making, using, selling, offering to sell, and/or importing of the Liberty Meter constitutes an act of infringement against each Patent-in-Suit.

**D.     Duncan's Pre-Suit Knowledge of The Patents-In-Suit**

27.     For the reasons discussed herein, on information and belief, each Defendant had actual pre-suit knowledge of the Asserted Patents and/or its respective applications prior to this action or willfully blinded itself to the existence of those patents.  In any event, each Defendant had actual knowledge of each Asserted Patent no later than the filing of the Original Complaint in this action.

28.     CivicSmart is specifically aware of the '310 and '054 patents and has been since at least August 2015.  In July 2015 IPS Group brought a lawsuit, Case No. 15-cv-1526-CAB (S.D. Cal.) ("the 1526 Action") against both DSI and DPT.  In that litigation, IPS Group alleges that both DSI and DPT infringe the '310 and '054 patents by virtue of their making, using, selling, offering to sell, and/or importing the Liberty Meter.  On information and belief, either DSI or DPT (or both) informed CivicSmart of the existence of the lawsuit, of the existence of the '310 and '054 patents, and of IPS Group's specific contentions that the Liberty Meter infringes both patents.

29.     In any event, DPT's knowledge of the '310 and '054 patents and of IPS Group's allegations regarding infringement can be imputed to CivicSmart.  CivicSmart is merely an alter ego of DPT and therefore DPT's knowledge is equivalent to CivicSmart's knowledge.  Also, Michael Nikolaus (CivicSmart's CEO) is, on information and belief, an officer of DPT and became aware of the '310 and '054 patents as well as IPS Group's allegations of infringement shortly after IPS Group filed the '1526 Action.  As CEO of CivicSmart, Mr. Nickolaus's knowledge can also be imputed to CivicSmart.

30.     Each Defendant also had pre-suit knowledge of the '832, '403, '474, and '691 patents.  First, on January 10, 2017, counsel for IPS Group in the '1526 Action sent an email to the attorneys representing both DSI and DPT in the '1526 Action.  In this email, IPS Group's counsel specifically identified each of the '832,

1    '403, '474, and '691 patents.  On information and belief, DSI and DPT's attorneys

2    shared this information with their respective clients shortly after receiving it.

3    Moreover, DPT's knowledge of the '832, '403, '474, and '691 patents can be

4    imputed to CivicSmart for the reasons discussed above.  Further, DPT's attorneys

5    represented that they had communicated with CivicSmart regarding the substance

6    of the January 10, 2017 email.

7         31.    DSI and DPT each had knowledge of the '832, and '403 patents going

8    back even before the January 10, 2017 email.  Both DSI and DPT were made

9    aware of the '832 and '403 Patents during the course of DSI's and DPT's

10    prosecution of their own patents.

11         32.    <u>The '832 Patent</u>.  For example, the face of United States Patent No.

12    D714165, issued to DSI on September 30, 2014, cites the '832 Patent.  Likewise,

13    the face of United States Patent No. D747983, issued to DPT on January 26, 2016,

14    also cites the '832 Patent.  DSI and DPT were therefore aware of these patents at

15    least as early as these dates.  Moreover, DPT's knowledge can be imputed to

16    CivicSmart for the reasons discussed above.

17         33.    <u>The '403 Patent</u>.  The face of United States Patent No. 9,123,184,

18    issued to DPT on September 1, 2015, cites the '403 Patent.  On information and

19    belief DPT was aware of the '403 Patent on or before DSI sold DPT to CivicSmart.

20    Thus, DPT's knowledge can be imputed to DSI, as DPT's alter ego at least until

21

DPT was sold to CivicSmart.  Similarly, DPT's knowledge can also be imputed to CivicSmart for the reasons discussed above.

34.    On information and belief, DSI and DPT monitored IPS Group's patent filings.  On information and belief, DSI and DPT gained knowledge of the '832, '403, '474, and '691 patents in this way.  Indeed, on multiple occasions representatives from DSI and DPT made offers to acquire IPS Group and its patented technology.  For example, on February 11, 2009, Anthony Kahn (a current and/or former Director for Duncan Solutions) sent an email from his email address akahn@duncansolutions.com to IPS Group's CEO David King.  In this email, Mr. Kahn stated that "As I have previously said we think your (and your team's) experience and expertise would be of great value to our whole products business so a merger on appropriate terms may make most sense."  Mr. Kahn also stated that "I agree your patents might slow them down but from my limited experience is that defending challenges to patent applications absorbs a lot of time and effort, costs a fortune and by the time the party successfully upholds its patent the world has changed enough so that the patents are no longer barriers."  On information and belief, DSI and DPT continued to monitor IPS Group's patent application activity, including the filing and issuance of the '832, '403, '474, and '691 patents.  Likewise, after the sale of DPT to CivicSmart, CivicSmart would have shared DPT's knowledge of the '832, '403, '474, and '691 patents, and based

1   on this monitoring of IPS Group's patent application activity, was also aware of

2   the '310 and '054 patents.

3        35.    The city of Milwaukee, Wisconsin issued a request for proposals for

4   single-space smart meters. IPS Group submitted a response to this request,

5   submitting its patented meters for consideration by Milwaukee.  Also, on

6   information and belief, CivicSmart and DPT submitted a response for the request,

7   submitting the Liberty Meter as a candidate to be considered.

8        36.    On information and belief, as part of the bidding process for the

9   Milwaukee business, CivicSmart and DPT represented to Milwaukee city

10  employees that IPS Group admitted that a Liberty Meter with the solar panel

11  removed would not infringe any IPS Group patents.

12       37.    IPS has never stated in Court during any legal proceeding or

13  elsewhere that the removal of the solar panel from the Liberty meter would avoid

14  infringement of IPS Group's patents.

15       38.    CivicSmart's / DPT's statement is demonstrably false.  The patents at

16  suit in this litigation clearly show claims for parking meters and their respective

17  components that do not require a solar panel. *See, e.g.,* the '832 patent (claim 1),

18  the '403 patent (claim 1), and the '474 patent (claim 18), the '691 patent (claim 1).

19       39.    On information and belief, in reliance on CivicSmart's / DPT's untrue

20  statements, the City of Milwaukee began using the Liberty Meter.

21

40.     On information and belief, CivicSmart and DPT have continued to make false and misleading statements about IPS Group. CivicSmart and DPT have approached customers and potential customers with false and deceptive messages alleging that IPS Group has admitted that a Liberty Meter without a solar panel does not infringe IPS Group's patents.

41.     CivicSmart and DPT know that these statements are not true. Both CivicSmart and DPT are well aware – and have been since before the filing of this litigation – that IPS Group believes a Liberty Meter without a solar panel still infringes IPS Group's patents.

## INFRINGEMENT OF THE PATENTS-IN-SUIT

42.     Any act of making, using, offering to sell, selling, and/or of importing the Liberty Meter directly infringes one or more claims of the Patents-in-Suit.

43.     With respect to the '054 Patent, the Liberty Meter infringes at least Claim 1. The Liberty Meter is a parking meter device. *See, e.g.*, Ex. 8 (Duncan Solutions' May 2, 2013 Response to Durango, CO's Request for Proposal) at Page 246. The Liberty Meter practices each element of claim 1. For example:

     a.  A timer. Specifically, the Liberty Meter includes a timer that displays the time purchased and/or remaining. *See, e.g.,* Ex. 7 at 165. *See, also,* Ex. 8 at 246.

     b.  A payment facilitating arrangement operable in cooperation with a non-cash payment medium for effecting payment of a monetary

1    amount for a parking period.  The Liberty Meter includes

2    electronic / mechanical structures that include a card access

3    opening and a card reader or card writer, including "secure PCI-

4    compliant credit processing." *See* Ex. 7 at 188. *See, also, e.g.*, Ex.

5    8 at 246.  These electronic / mechanical structures are operable in

6    cooperation with a non-cash payment medium for effecting

7    payment of a monetary amount for a parking period, as is

8    demonstrated by the fact that a motorist may pay for parking using

9    either a credit card or a pay-by-phone option. Ex. 7 at 164 (section

10   entitled "Pay-by-Cell Phone Payments"). Duncan advertised the

11   Liberty Meter as "[f]eaturing advanced credit card acceptance,

12   solar power and wireless real-time communication." Ex. 8 at 296.

13   Duncan's marketing materials state that the Liberty Meter

14   "[a]ccepts coins, credit cards, debit cards, smart cards and pay-by-

15   cell payment" and has a "[p]ay-by-cell option with payment visible

16   at the meter." *Id.* at 297. *See also* Ex. 7 at 165.

17       c.   A display that visually provides a balance remaining of the parking

18            period and wherein the display provides the amount of time

19            purchased in response to the received input from the user.

20            Specifically, the Liberty Meter "shall display the time purchased…

21            valid parking time and/or grace period and/or expired by way of a

1   variable colored lighting solution for ease of recognition." *See,*

2   *e.g.*, Ex. 8 at 251-252.

3   d.   A power management facility that supplies power to the timer,

4   payment facilitating arrangement, and display. Specifically, the

5   Liberty Meter is advertised to be "[s]olar powered with

6   rechargeable battery pack for extended life" and includes

7   "[i]ntelligent software to minimize power consumption."  Ex. 8 at

8   297. *See, also, e.g., id.* at 246, 249, 251, 255, 257. In particular, the

9   Liberty Meter includes circuitry and/or software that, at the very

10   least, can manage the amount of power delivered to the meter's

11   backlit screen "when the meter is not in use." Ex. 7 at 166.

12   Likewise, this circuitry and/or software is capable of minimizing

13   power consumption by "disabling the enforcement LED lights on

14   the sides of the display." *Id.*

15   e.   A wireless communications subsystem configured to receive

16   information relating to the non-cash payment medium in respect of

17   the payment facilitating arrangement. The Liberty Meter is

18   advertised as "[f]eaturing advanced credit card acceptance, solar

19   power and wireless real-time communication."  *See, e.g.,* Ex. 7 at

20   164, 169. The Liberty Meter has wireless communication

21   components that allow it to "[a]ccept[] coins, credit cards, debit

cards, smart cards and pay-by-cell payment." The payment apparatus necessarily includes wireless components because there is a "[p]ay-by-cell option with payment visible at the meter." Ex. 8 at 297. *See, also, e.g.*, *id.* at 246, 249.

f.  A keypad sensor that receives input comprising manipulation by the user and wherein the keypad sensor operates the parking meter and determines parking time amount for purchase in accordance with the received input from the user.  Specifically, the Liberty Meter has a "[t]actile key panel with four buttons for intuitive payment navigation." *Id.* at 297. *See, also, e.g.*, *id.* at 246.

g.  A coin slot into which coins are inserted for delivery to the coin sensor and then to a coin receptacle.  Specifically, the Liberty Meter is advertised as having a "coin chute" that "[a]ccepts up to sixteen different coins and/or metal tokens through a single slot" and has [a]dvanced coin track sensors for self-calibration and detection of non-metallic jams." Ex. 8 at 297. This coin chute leads to a "[c]oin box retainer" that "ensures proper replacement and alignment of the coin box to receive coins before the vault doors is re-locked." *Id.* at 191. *See, also, e.g.*, *id.* at 246; Ex. 7 at 164 (section entitled "Coin Validator") . Moreover, the "receptacle is

designed to receive sealed and locked coin boxes" from the Liberty
Meter. Ex. 7 at 219.

h. An upper portion with a solar panel that charges the power
management facility (*see, e.g.*, *id.* at 246, 249, 251, 255, 257.),
and a lower portion that has a shape and dimensions such that the
lower portion is receivable within the housing base (*see, e.g.*, *id.* at
296-297), where the upper portion contains a cover configured to
accommodate the upper portion and that is engageable with the
housing base of the single space parking meter such that the
payment facilitating arrangement is accessible by the user for user
manipulation effecting the payment of the monetary amount for the
parking period when the lower portion of the parking meter device
is received within the housing base and the upper portion is
covered by the cover.  The Liberty Meter has both a lower portion
and an upper portion. In particular, the fact that portions of the
Liberty Meter device typically extend outside the housing base
when it is received does not mean that the lower portion of the
device does not have shape and dimensions such that it is
receivable within a housing base. The Liberty Meter contains a
lower portion with shape and dimensions such that it is received
within the housing base and an upper portion extending above the

portion of the meter that is received within the housing base. *See, e.g.,* Ex. 7 at 161, 170, 191.

44.     With respect to the '310 Patent, the Liberty Meter infringes at least Claim 1.  The Liberty Meter is a parking meter device.  (*See, e.g.*, Exhibit 8 at 246.)  The Liberty Meter meets each element of claim 1. For example:

a. A coin sensor. Specifically, the Liberty Meter includes a coin validator which includes a coin sensor. The Liberty Meter "[a]ccepts coins, credit cards, debit cards, smart cards, and pay-by-cell payment . . . Accepts up to sixteen different coins and/or metal tokens through a single slot . . . Coin chute is easily and quickly field services; vandal resistant coin slot … advanced coin track is self-calibration . . . detects metallic and non-metallic jams." *See, e.g.*, *id.* at 297.

b. A card reader electrically linked to provide information to the electronic device to provide information of whether payment has been made.  The Liberty Meter includes a card reader.  *See, e.g.*, *id.* at 246. Specifically, "one card slot functions for credit, debit, and smart card payments. The user simply inserts the card and withdraws it quickly. Once read, the meter displays a default amount of time, predetermined by the City. The motorist can use the up and down arrow keys to increase the amount of time to the maximum allowed, or decrease the amount of time. Pressing the 'OK' button confirms the transaction, while the 'C/Cancel' button

completely clears it from the meter." *See also id.* at 251 ("Meters shall have replaceable faceplates describing payment options (credit card, coins, smart cards, pay be cell)"); *id.* at 252 ("All Parking Meter solutions shall accept smart cards (standard and customized)"). The Liberty Meter's card reader accepts a variety of payments, including various credit and debit cards. *See* Ex. 7 at 163.

c.  An electronic device connected to the coin sensor and the card reader that may receive information electronically therefrom (e.g. whether a coin or a card has been inserted). Specifically, the Liberty Meter can receive information from the coin sensor regarding a jam. Ex. 7 at 164. The coin sensor sends other information the electronic device, relating to the validity or invalidity of items inserted into the coin slot. *Id.* The card reader also sends information including the type of information necessary to make a credit card transaction  and receive authorization, and whether the card is inserted or if there is an obstruction in the card slot. *See, id.,* at 165.

d.  The electronic device having a screen that provides information visually and is visible through the window of the control panel when the cover panel is attached to the intermediate panel. Specifically, the Liberty Meter touts its high-resolution display as being "easy to read and highly customizable benefiting both the motorists who park at the meter and the

technicians who perform maintenance on the meters." Ex. 7 at 144.

Moreover, the Liberty Meter is described as being "custom programmed to communicate the City's rates and parking hours. It walks the motorist through the payment with a clear, step-by-step process; ensuring greater motorist compliance to the City's parking ordinances. For meter technicians, excellent screen visibility makes it easier for them to perform required maintenance and quickly return the meter to normal operation." *Id. See also, e.g.* Ex. 8 at 251-252, 296;

e. a telephone connection (*e.g.* cellular) to provide receiving information in respect of a card used in respect of said card reader. Specifically, the Liberty Meter allows the cardholder to elect a credit/debit transaction and swipe the card at the meter. The transaction information is sent by a wireless communications provider such as AT&T, Verizon, or T-Mobile to the gateway via secure VPN (Virtual Private Network). Gateway providers that Duncan has worked with include Merchant First, Caledon, and Paypal. Ex. 7 at 169. *See also, e.g.,* Ex. 8 at 246, 249.

f. connections for at least one rechargeable battery to power the reader, sensor and device.  Specifically, the Liberty Meter "must be solar powered and shall use solar panel and combination rechargeable/back-up battery pack to provide ongoing power and backup power." Ex. 7 at 162. *See also, e.g., id.* at 166, Ex. 8 at 246, 249, 251, 255, 257.

g.  a solar cell operatively associated with said connections to charge said battery. Specifically, Duncan advertised that the Liberty Meter is "[s]olar powered with rechargeable battery for extended battery life." Ex. 8 at 297. *See, also, e.g.*, Ex. 8 at 246, 249, 251, 255, 257; Ex. 7 sections "2.A.3 Solar/Battery" and "Fully Rechargeable Battery").

h.  a housing in which the coin sensor, card reader, and electronic device are located, the housing comprising an intermediate panel set and a cover panel, wherein the cover panel is movably attached to the intermediate panel set, and a surface of the cover panel and a surface of the intermediate panel set comprise a front face, and the front face surface of the cover panel includes a control panel having a window and a plurality of buttons that operate the parking meter upon manipulation by a user. To be operable, the Liberty Meter is installed in a housing that meets the requirements of this element. *See, e.g.*, Ex. 8. at 296-297 (the image on page 296 showing the housing with a cover panel, intermediate panel set, front face, control panel and window, and plurality of buttons.) The following image depicts how the Liberty Meter literally meets this element:

1

2

3

4

5

6

7

8

9

10

11

12



13        Additionally, even if this limitation is not literally met (and it is), the Liberty

14    Meter still infringes this element under the doctrine of equivalents, as a change

15    and the previse configuration and location of the various components – such as

16    the exact location of the plurality of buttons – is merely an insubstantial

17    difference.  Indeed, a difference in the location of the buttons (such as, for

18    example, being located on the front face of the intermediate panel or on the

19    electronic device instead of the front face of the cover panel) is substantial

20    because the buttons perform substantially the same function, in substantially the

21

same way, to achieve substantially the same result as the literal language of the claims.

    i.   A coin slot in the front face into which coins are inserted for delivery to the sensor and then to a coin receptacle.  The Liberty Meter includes components that comprise the free-fall coin chute. *See, e.g.*, Ex. 8 at 296-297.

    j.   A card slot in the front face into which a card is inserted to be read by said reader. Specifically, to "complete a payment, the motorist inserts and withdrawals their credit card, uses the [up and do] arrows to increase or decrease the amount of parking time." Ex. 7 at 165.

    k.   A rear face comprising a surface of the cover panel and a surface of the intermediate panel set providing a window aperture via which said solar cell is exposed to light.  Specifically, the rear face of the Liberty Meter includes a window aperture via which solar cells are exposed to light. Exhibit 7 at 161. *See also, id.* at 166 ("[t]wo solar panels, one on each side of the mechanism, provide power to the Liberty. Fully secure under the meter dome, these solar panels allow minimum power absorption") and 196 (discussing manufacturing of UV –resistant, high impact polycarbonate material).

    45.    With respect to the '832 Patent, the Liberty Meter infringes at least Claim 1.  The Liberty Meter contains a power supply unit that supplies power to

1    the Liberty Meter.  The Liberty Meter's power supply unit meets each element of

2    claim 1. For example, the Liberty Meter includes:

3        a.  A rechargeable, main battery.  Specifically, the Liberty Meter is required to

4            "clearly display a low battery condition when this situation occurs and/or

5            failing/low rechargeable batteries in the case of the solar batteries used in the

6            cellular wireless credit card enabled meter system…" Ex. 8 at 251.

7            Moreover, the Liberty Meter contains a "solar rechargeable battery system,"

8            which has "an independent backup battery system." *Id.* at 255. *See also id.* at

9            296 ("Solar powered with rechargeable battery for extended battery life.");

10           *id.* at 297 ("solar powered with rechargeable and backup batteries for

11           extended life"); Ex. 7 at 162 ("The Liberty utilizes two solar panels and a

12           rechargeable/back-up battery pack."); *id.* at 166 ("Two solar panel, one on

13           each side of the mechanism, provide power to the Liberty . . . Rechargeable

14           batteries and a backup battery fully operate the mechanism independently of

15           the other. Because Liberty Meter includes a rechargeable, main battery, it

16           meets this element of the claim.

17       b.  A charging arrangement for charging the main battery.  Specifically, the

18           Liberty Meter contains solar panels which recharge the main battery. For

19           example, the Liberty Meters contain "protected, recharging solar panel(s), to

20           allow solar charging regardless of meter location relative to the sun." Ex. 8

21           at 255. *See also id.* at 296 ("Solar powered with rechargeable battery for

1    extended battery life."); *id.* at 297 ("solar powered with rechargeable and

2    backup batteries for extended life"); Ex. 7 at 166 ("Two solar panels, one on

3    each side of the mechanism, provide power to the Liberty . . . Rechargeable

4    batteries and a backup battery fully operate the mechanism independently of

5    the other."). Therefore, because the Liberty Meter contains solar panels that

6    recharge a main battery, it meets this element of the claim.

7    c.   A set of connectors for a back-up battery.  Specifically, the Liberty Meter

8         contains a back-up battery with connectors to the rest of the meter. For

9         example, the Liberty Meter contains a solar rechargeable battery system and

10        an independent back up battery system. *See* Ex. 8 255, 297.  *See also* Ex. 7

11        at 162, 166 (describing two solar panels and a rechargeable battery pack that

12        provides power directly to the Liberty Meter). Because the Liberty Meter's

13        battery sources provides power directly to the meter, the Liberty Meter

14        meets this element of the claim.

15   d.   A wireless communication device for communicating a status message

16        regarding the state of the main battery and the state of the back-up battery to

17        a control system external to the parking meter.  For example, the Liberty

18        Meter utilizes a solar charging system that is "internally diagnosed" with

19        data that is "stored and reported on the web-portal back end application

20        Parking Enterprise [Manager] (PEM)." Ex. 8 at 255. The PEM is further

21        "wirelessly networked with the Liberty [Meter] to provide real-time

1  operation and revenue data." Ex. 7 at 162. Such data includes "current

2  battery voltage (main and rechargeable), minimum battery voltage (main and

3  rechargeable) since last call in…" *Id.* at 172. Therefore, the Liberty Meter

4  contains a wireless communication device for communicating a status

5  message regarding the state of the main battery and the state of the back-up

6  battery to a control system external to the parking meter.

7  e.  A set of load terminals for connection to a load.  Specifically, the Liberty

8  Meter contains a solar rechargeable battery system that has an independent

9  backup battery system. *See* Ex. 8 at 255, 296 ("Solar powered with

10 rechargeable battery for extended battery life."), and 297("solar powered

11 with rechargeable and backup batteries for extended life"); *see also* Ex. 7 at

12 162 ("The Liberty utilizes two solar panels and a rechargeable/back-up

13 battery pack."); at 166 ("Two solar panel, one on each side of the

14 mechanism, provide power to the Liberty . . . Rechargeable batteries and a

15 backup battery fully operate the mechanism independently of the other.")

16 The Liberty Meter therefore necessarily contains load terminals to connect

17 the power supply to a load.

18 f.  A control unit for controlling supply of power to the load primarily from the

19 main battery and secondarily from the back-up battery.  For example, this

20 control system can switch the source of the power to the load between the

21 main battery and the backup battery. Ex. 8 at 255 ("The solar rechargeable

battery system shall have an independent backup battery system. Both

systems shall be capable of fully operating the mechanism independent of

each other, if necessary."), 296 ("Solar powered with rechargeable battery

for extended battery life."), 297 ("solar powered with rechargeable and

backup batteries for extended life"); *see also* Ex. 7 at 162 ("The Liberty

utilizes two solar panels and a rechargeable/back-up battery pack."); at 166

("Two solar panel, one on each side of the mechanism, provide power to the

Liberty . . . Rechargeable batteries and a backup battery fully operate the

mechanism independently of the other."). Therefore, the Liberty Meter

contains a control unit that can control the supply of power to the load

primarily from the main battery and secondarily from the back-up battery.

g. A housing that encloses the main battery, the back-up battery, the control

unit, and the wireless communication device wherein the housing includes

the load terminals and is received within the parking meter.  The Liberty

Meter contains a casing that encloses all of the components of the liberty

meter, including the main battery (Ex. 8 at 296, 297, showing the housing of

the Liberty Meter, which contains features including a "[s]olar powered with

rechargeable battery for extended battery life"), the back-up battery (*id.*), the

control unit (*id.*) "intelligent software to minimize power consumption…

Retains full audit data during battery removal and exchange"), and the

wireless communication device (*id.*)  "secure real-time communication via

1    GPRS network to AutoTRAX and AutoISSUE management systems…

2    "Over-the-Air" meter updates for configuration and rate programming")).

3    On information and belief, this housing for the Liberty also includes the load

4    terminals and can be received within the parking meter.

5    46.     With respect to the '403 Patent, the Liberty Meter infringes at least

6    Claim 1.  The Liberty Meter meets each element of claim 1. The Liberty Meter is a

7    parking meter device.  *See, e.g.*, Ex. 8 at 191.  For example, the Liberty Meter

8    includes:

9        a.  An internal clock.  Specifically, the Liberty Meter contains "real-time

10           clock automatically synchronizes with centralized server." Ex. 8 at  242.

11       b.  A display. Specifically, the Liberty Meter "displays a default amount of

12           time, predetermined by the City." *See id.* at 246.

13       c.  A communication subsystem configured to provide two-way wireless

14           communication. Specifically, the Liberty Meter includes communication

15           capabilities, which enables the Liberty Meter to "communicate with the

16           operating system without the need to install costly and disruptive

17           ancillary infrastructure. Everything the Liberty needs to process credit

18           cards and report to the PEM (Parking Enterprise Manager software

19           system) is included in the mechanism without additional equipment being

20           mounted on the existing meters or poles." *See id.*

21

d.  A controller module coupled to the internal clock, the display, and the communication subsystem that, on information and belief, is configured to control the communication subsystem to receive data indicative of a remote payment being completed, control the display to display an amount of time purchased by the remote payment for a parking session, monitor the clock to determine an amount of time remaining in the parking session, control the display to display the amount of time remaining, power down at least a portion of the communication subsystem subsequent to receiving the data indicative of the remote payment being completed, wake up the powered down portion of the communication subsystem upon determining that the amount of time remaining is below a threshold time prior to expiration of the parking session, receive an indication of additional time being paid for remotely, and control the display to update the displayed time remaining to reflect the additional time.  The Liberty Meter's controller module is coupled to an internal clock, the display, and a communication subsystem, and is configured to control the communication subsystem to receive data indicative of a remote payment being completed.  For example, the Liberty Meter "offers pay-by-cell technology services through a variety of the parking industry's leading service providers, including integration with enforcement and meter products through companies such as

ParkMobile, Verrus (Paybyphone), and QuickPay, and others." *See id.* at 246. Further, the Liberty Meter can be integrated wirelessly with pay-by-cell providers to offer a "push to meter service". *Id.* In this configuration, upon completion of a successful transaction, the payment is sent to the parking meter in real-time. *Id.* When the transaction is complete, the meter displays the amount of time purchased for a parking session. *Id.* ("provides positive confirmation to the motorist at the meter"). On information and belief, the Liberty Meter's controller module powers down at least a portion of a communication subsystem subsequent to receiving the data indicative of the remote payment being completed. On information and belief, the Liberty Meter's controller module wakes up the powered down portion of the communication subsystem upon determining that the amount of time remaining is below a threshold time prior to expiration of the parking session, receives an indication of additional time being paid for remotely, and controls the display to update the displayed time remaining to reflect the additional time .

e.  The controller is further configured to, on information and belief, upon waking up the powered down portion of the communication subsystem, control the communication subsystem to transmit a message to a remote management system or to a wireless device of the registered user indicating the time remaining is approaching expiration time.  For

example, the ParkMobile system that is compatible with the Liberty

Meter is configured to send notifications to a registered user's mobile

device indicating the time remaining is approach expiration time.

Likewise, the Liberty Meter is configured to operate with the PEMS

management software to provide real-time enforcement information even

through a pay-by-cell option. *See id.* at 261 ("Management System …

Systems for each of the individual components must integrate with each

other so that information from the . . . cellular wireless communicating

Meters . . . shall share information for real-time enforcement and parking

management with the Pay by Cell…") and 273. ("System shall provide

for real-time alarm and status reporting for system monitoring and

maintenance… System shall provide for real-time and historical

management information reporting").

47.     With respect to the '474 Patent, the Liberty Meter infringes at least

Claim 18.  The Liberty Meter meets each element of claim 18.  For example, the

Liberty Meter  contains a power supply for supplying power to the Liberty Meter.

This power supply unit includes:

a.  A rechargeable main battery.  Specifically, the Liberty Meter is required

to "clearly display a low battery condition when this situation occurs

and/or failing/low rechargeable batteries in the case of the solar batteries

used in the cellular wireless credit card enabled meter system…" Ex. 8 at

251. Moreover, the Liberty Meter contains a "solar rechargeable battery system," which has "an independent backup battery system." *Id.* at 255. *See also id.* at 296 ("Solar powered with rechargeable battery for extended battery life."); at 297 ("solar powered with rechargeable and backup batteries for extended life"); Ex. 7 at 162 ("The Liberty utilizes two solar panels and a rechargeable/back-up battery pack."); at 166 ("Two solar panel, one on each side of the mechanism, provide power to the Liberty . . . Rechargeable batteries and a backup battery fully operate the mechanism independently of the other. Because Liberty Meter includes a rechargeable, main battery, it meets this element of the claim.

b.  A charging arrangement comprising one or more terminals for connecting the main battery to one or more charging sources. Specifically, the Liberty Meter contains solar panels which recharge the main battery. For example, the Liberty Meters contain "protected, recharging solar panel(s), to allow solar charging regardless of meter location relative to the sun." Ex. 8 at 255. *See also id.* at 296 ("Solar powered with rechargeable battery for extended battery life."); *id.* at 297 ("solar powered with rechargeable and backup batteries for extended life"); Ex. 7 at 166 ("Two solar panels, one on each side of the mechanism, provide power to the Liberty . . . Rechargeable batteries and a backup battery fully operate the mechanism independently of the

1    other."). Therefore, because the Liberty Meter contains solar panels that

2    recharge a main battery, it meets this element of the claim.

3    c.  A replaceable and non-rechargeable back-up battery. For example, the

4        Liberty Meter is "[s]olar powered with rechargeable and backup batteries

5        for extended life. *See* Ex. 8 at 297. *See also id.* at 283 ("Liberty D & AA

6        Battery Pack (Includes required harness and connectors").

7    d.  On information and belief, the Liberty Meter's power supply includes at

8        least one capacitor.

9    e.  A connection to a wireless communication device for communicating a

10       status message regarding the state of the main battery and the state of the

11       back-up battery to a control system external to the parking meter.  The

12       Liberty Meter is configured to send information regarding the power

13       system to an external control system called PEMs or AutoTRAX.

14       Specifically, the Liberty Meter contains a solar charging system that is

15       internally diagnosed, with the data stored and reported on the web-portal

16       back end application Parking Enterprise Manager (PEM). *See* Ex. 8 at

17       255. The PEM in turn is wirelessly networked with the Liberty Meter to

18       provide real-time operation and revenue data. *See* Ex. 7 at 162. A report

19       ("Current Meter Status/Health") is generated, which includes items such

20       as current battery voltage (main and rechargeable), minimum battery

21       voltage (main and rechargeable) since last call in..."). *Id.* at 172.

1   Therefore, the Liberty Meter includes a connection to a wireless

2   communication device for communicating a status message regarding the

3   state of the main battery and the state of the back-up battery to a control

4   system external to the parking meter.

5   f.   A connection to a control unit for controlling supply of power to the

6   parking meter primarily from the main battery and secondarily from the

7   back-up battery.  Specifically, the Liberty Meter contains a solar

8   rechargeable battery system that has an independent back up battery

9   system. *See* Ex. 8 at 255. "Both systems shall be capable of fully

10   operating the mechanism independent of each other, if necessary." *Id. See*

11   *also*, *id.* at 297 ("Solar powered with rechargeable and backup batteries

12   for extended life"); *see also* Ex. 7at 166 ("Rechargeable batteries and a

13   backup battery fully operate the mechanism independently of the

14   other.").  On information and belief, during peak power demand a

15   capacitor assists in the supply of power.

16   g.   The main battery, the back-up battery, the at least one capacitor, the

17   wireless communication device, and the control unit are received within

18   the parking meter.  The Liberty Meter encloses all of the components of

19   the liberty meter, including the main battery (Ex. 8 at 296, 297, showing

20   the housing of the Liberty Meter, which contains features including a

21   "[s]olar powered with rechargeable battery for extended battery life"), the

back-up battery (*id.*), the control unit (*id.*) "intelligent software to minimize power consumption… Retains full audit data during battery removal and exchange"), and the wireless communication device (*id.*) "secure real-time communication via GPRS network to AutoTRAX and AutoISSUE management systems… "Over-the-Air" meter updates for configuration and rate programming"). *See also* the image of the Liberty Meter at Ex. 7 at 188.

48.    With respect to the '691 Patent, the Liberty Meter infringes at least Claim 1 of the '691 Patent.  .  The Liberty Meter meets each element of claim 1. For example, the Liberty Meter is a meter device.  (*See, e.g.*, Exhibit 8 at 246.)  It includes:

a.  An internal clock.  Specifically, the Liberty a "real-time clock [that] automatically synchronizes with centralized server."). *See* Ex. 8 at 297.

b.  A display.  *See id.* 246 ("Once read, the meter displays a default amount of time, predetermined by the City.").

c.  A communication subsystem configured to provide two-way wireless communication.  Specifically, the Liberty Meter includes a wireless communication that enables the Liberty Meter to communicate with the operating system without ancillary infrastructure. *See id.* Further, "everything the Liberty needs to process credit cards and report to the PEM (Parking Enterprise Manager software system) is included in the

1    mechanism without additional equipment being mounted on the existing

2    meters or poles." *Id.*

3    d. The claimed controller module.  The Liberty Meter's controller module is

4    configured to control the communication subsystem to receive data

5    indicative of a remote payment being completed.  Specifically,  "Duncan

6    Liberty offers pay-by-cell technology services through a variety of the

7    parking industry's leading service providers, including integration with

8    enforcement and meter products through companies such as ParkMobile,

9    Verrus (Paybyphone), and QuickPay, and others."). *See id.* at 246. *See*

10   *also id.* at 261 ("Management System … Systems for each of the

11   individual components must integrate with each other so that information

12   from the . . . cellular wireless communicating Meters . . . shall share

13   information for real-time enforcement and parking management with the

14   Pay by Cell…"). Furthermore, "Duncan can integrate wireless single-

15   space and multi-space meters with some of these pay-by-cell providers to

16   offer a "push to meter service". *Id.* at 246. In this configuration, upon

17   completion of a successful transaction, the payment is sent to the parking

18   meter in real-time. This then adds time to the meter which not only

19   greatly simplifies the enforcement process, but also provides positive

20   confirmation to the motorist at the meter." *Id.*  Additionally, the claimed

21   controller module is configured to control the display to update the

displayed time remaining to reflect the additional time in a second

amount of new time remaining.  Specifically, when payment goes

through the meter displays an amount of time purchased by the remote

payment for a parking session.  *Id.* ("provides positive confirmation to

the motorist at the meter.").

e.  The Liberty Meter also provides for real-time alarm and real-time and

historical status reporting for system monitoring and maintenance. *Id.* at

273. *See also* ¶ 46, *supra*.)

49.     In this Complaint, IPS Group alleges that defendant CivicSmart

infringes each of the Patents-in-Suit.  Likewise, IPS Group alleges that defendants

DSI and DPT each infringe the '832, '403, '474, and '691 patents.

## **FIRST CAUSE OF ACTION**

### **(Patent Infringement by CivicSmart of U.S. Patent No. 8,595,054)**

50.     IPS Group repeats and realleges the allegations of the foregoing

paragraphs of this Complaint as though fully set forth herein.

51.     CivicSmart is liable for directly infringing at least Claim 1 of the '

054 Patent pursuant to 35 U.S.C. § 271(a).  CivicSmart makes, uses, sells, offers to

sell, and/or imports infringing Liberty Meters into the United States, without

permission from IPS Group.

52.     Claim 1 is recited here as a representative claim for exemplary purposes only.  IPS Group intends to allege additional claims of the '054 Patent and will do so in accordance with the Court's rules and procedures.

53.     As alleged *supra*, CivicSmart is aware of IPS Group's allegations that the Liberty Meter infringes the claims of the '054 Patent.  Accordingly, CivicSmart knows that it and its customers, resellers, and end-users use the Liberty Meter in an infringing manner particularly.  CivicSmart encourages its customers, resellers, and end-users to use the Liberty Meters in an infringing manner as set forth in the preceding Paragraphs.

54.     In particular, when a Liberty Meter is placed into operation and installed at a specific parking space, use of that Liberty Meter is the only way by which an end-user may utilize the specific parking space.  Each such use of the Liberty Meter—*i.e.* each act of paying the parking meter either by coin, credit card, or alternative method—constitutes a separate act of direct infringement of the claims of the '054 Patent.

55.     Additional examples of CivicSmart's actions taken to induce its customers, resellers, and end-users include: offering ongoing training regarding the Liberty Meters; selling or offering to sell spare parts regarding the Liberty Meters; providing installation, training, and ongoing support manuals regarding the use and installation of the Liberty Meters (which includes using the Liberty Meters in an

1    infringing manner); and offering various "tag along" products that use or are used

2    in connection with the Liberty Meters.

3         56.    On information and belief, CivicSmart, without authority, has induced

4    and continues to induce infringement of the '054 Patent in violation of 35 U.S.C. §

5    271(b) inasmuch as:

6              a.    The Liberty Meters infringe during the normal use of the

7    Liberty Meters by CivicSmart customers, resellers, and/or end-users;

8              b.    CivicSmart has known and has been continuously aware of the

9    '054 Patent since before the filing of this action, as discussed above;

10             c.    CivicSmart has acted in a manner that encourages and

11   continues to encourage others to infringe the '054 Patent by, among other things,

12   intentionally directing, instructing, or encouraging customers or end-users to use

13   the Liberty Meters in a manner that CivicSmart knows or should have known

14   would cause the customers or end-users to infringe the '054 Patent;

15             d.    CivicSmart sells, distributes, and supplies the Liberty Meters to

16   customers and end-users with the intent that the products be used in an infringing

17   manner;

18             e.    CivicSmart provides the services and products identified above

19   designed to instruct, encourage, and direct customers and end-users to use the

20   products in an infringing manner; and,

21

1        f.      CivicSmart advertises, markets, and promotes the use of the

2  Liberty Meters in an infringing manner.

3       57.    As alleged above, incorporated herewith, and based upon information

4  and belief, Plaintiff alleges that CivicSmart has contributed and continues to

5  contribute to the infringement of Claim 1 of the '054 patent in violation of 35

6  U.S.C. § 271(c) inasmuch as:

7        a.     The Liberty Meters infringe the '054 Patent during the normal

8  use of the Liberty Meters by CivicSmart's customers, resellers, and end users

9  within the United States;

10       b.     CivicSmart has known and has been continuously aware of the

11  '054 Patent since before the filing of this action;

12       c.     CivicSmart imports into the United States, sells and/or offers to

13  sell within the United States the Liberty Meters and components thereof (including

14  but not limited to various spare parts to be used in the Liberty Meters) that (a)

15  practice the claimed parking meter device of the '054 Patent; and, (b) CivicSmart

16  knows constitute material infringing component(s) of the Liberty Meters, which

17  were made and/or especially adapted for use in the Liberty Meters;

18       d.     The Liberty Meters and components thereof are not staple

19  articles of commerce suitable for substantial non-infringing use with respect to the

20  '054 Patent at least because the Liberty Meters and components thereof have no

21  use apart from  making and/or using the inventions as claimed in the '054 Patent

1   (the parking meters and components thereof are used only in conjunction with or as

2   part of the claimed apparatus of the '054 Patent); and,

3            e.      CivicSmart sells, has sold, and/or has supplied the Liberty

4   Meters knowing of IPS Group's '054 Patent and knowing that the Liberty Meters

5   incorporate Plaintiff's patented device and/or were specially adapted for use in a

6   way that infringes the '054 Patent.

7        58.    CivicSmart has contributorily infringed the '054 Patent by providing

8   the Liberty Meters, including at least the Liberty Meters, to their customers,

9   resellers, and end-users who in turn make, use, sell, offer to sell, or import the

10  parking meter claimed in the '054 Patent as alleged above and that incorporates the

11  Liberty Meter as a component.  Further, components of the Liberty Meters

12  themselves, including but not limited to spare parts, are known by CivicSmart to be

13  especially made or specially adapted for use in infringement of the claims of the

14  '054 Patent, as alleged above.  These components constitute a material part of the

15  inventions covered by the '054 Patent because they can only be used in connection

16  with the Liberty Meters, and the Liberty Meters themselves (as made and as used)

17  infringe the '054 Patent.  Additionally, these components, as well as the Liberty

18  Meters themselves, are not staple articles or commodities suitable for substantial

19  non-infringing use because they are fundamental to and designed specifically to

20  provide functionality for the parking meter devices that infringe the '054 Patent.

21

59.     Unless enjoined by this Court, CivicSmart will continue to infringe the '054 Patent, and IPS Group will continue to suffer irreparable harm for which there is no adequate remedy at law.  Accordingly, IPS Group is entitled to preliminary and/or permanent relief against such infringement pursuant to 35 U.S.C. § 283.

60.     As a result of CivicSmart's infringement of the '054 Patent, IPS Group has been and continues to be irreparably injured in its business and property rights, and is entitled to recover damages for such injuries pursuant to 35 U.S.C. § 284 in an amount to be determined at trial.

61.     IPS Group is informed and believes, and on the basis of such information and belief, alleges that CivicSmart's infringement of the '054 Patent is willful and deliberate.  CivicSmart has had actual knowledge of the '054 Patent since at least May 14, 2014, yet continues to infringe this patent to this very day. As a result of CivicSmart's intentional actions, the infringement of the '054 Patent is willful and deliberate, entitling IPS Group to enhanced damages pursuant to 35 U.S.C. § 284 and to an award of attorney's fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

## SECOND CAUSE OF ACTION

### (Patent Infringement by CivicSmart of U.S. Patent No. 7,854,310)

62.     IPS Group repeats and realleges the allegations of the foregoing paragraphs of this Complaint as though fully set forth herein.

63.     CivicSmart is liable for direct infringement of at least Claim 1 of the '310 Patent pursuant to 35 U.S.C. § 271(a).  CivicSmart makes, uses, sells, offers to sell, and/or imports into the United States infringing Liberty Meters without permission from IPS Group.

64.     Claim 1 is recited here as a representative claim for exemplary purposes only.  IPS Group intends to allege additional claims of the '310 Patent and will do so in accordance with the Court's local rules and procedures.

65.     As alleged *supra*, CivicSmart is aware of IPS Group's allegations that the Liberty Meter infringes the claims of the '054 Patent.  Accordingly, CivicSmart is also aware that it and its customers, resellers, and end-users use the Liberty Meters in an infringing manner.  CivicSmart encourages its customers, resellers, and end-users to use the Liberty Meters in an infringing manner as set forth in the preceding Paragraphs.

66.     In particular, when a Liberty Meter is placed into operation and installed at a specific parking space, use of that Liberty Meter is the only way by which an end-user may utilize the specific parking space.  Each such use of the Liberty Meter—*i.e.* each act of paying the parking meter either by coin, credit card, or alternative method—constitutes a separate act of direct infringement of the claims of the '310 Patent.

67.     Additional examples of CivicSmart's actions taken to induce its customers, resellers, and end-users include: offering ongoing training regarding the

1   Liberty Meters; selling or offering to sell spare parts regarding the Liberty Meters;

2   providing installation, training, and ongoing support manuals regarding the use and

3   installation of the Liberty Meters (which includes using the Liberty Meters in an

4   infringing manner); and offering various "tag along" products that use or are used

5   in connection with the Liberty Meters.

6         68.    On information and belief, CivicSmart, without authority, has induced

7   and continues to induce infringement of the '310 Patent in violation of 35 U.S.C. §

8   271(b) inasmuch as:

9           a.    The Liberty Meters infringe during the normal use of the

10   Liberty Meters by CivicSmart's customers, resellers, and/or end-users;

11           b.    CivicSmart has known and has been continuously aware of the

12   '310 Patent since before the filing of this action, as discussed above;

13           c.    CivicSmart has acted in a manner that encourages and

14   continues to encourage others to infringe the '310 Patent by, among other things,

15   intentionally directing, instructing, or encouraging customers or end-users to use

16   the Liberty Meters in a manner that CivicSmart knows or should have known

17   would cause the customers or end-users to infringe the '310 Patent;

18           d.    CivicSmart sells, distributes, and supplies the Liberty Meters to

19   customers and end-users with the intent that the products be used in an infringing

20   manner;

21

e.      CivicSmart provides the services and products identified above designed to instruct, encourage, and direct customers and end-users to use the products in an infringing manner; and,

f.      CivicSmart advertises, markets, and promotes the use of the Liberty Meters in an infringing manner.

69.    As alleged above, incorporated herewith, and based upon information and belief, Plaintiff alleges that CivicSmart has contributed and continues to contribute to the infringement of Claim 1 of the '310 Patent in violation of 35 U.S.C. § 271(c) inasmuch as:

a.      The Liberty Meters infringe the '310 Patent during the normal use of the Liberty Meters by CivicSmart's customers, resellers, and end users within the United States;

b.      CivicSmart has known and has been continuously aware of the '310 Patent since before the filing of this action, as discussed above;

c.      CivicSmart imports into the United States, sells and/or offers to sell within the United States the Liberty Meters and components thereof (including but not limited to various spare parts to be used in the Liberty Meters) that (a) practice the claimed parking meter device of the '310 Patent; and, (b) CivicSmart knows constitute material infringing component(s) of the Liberty Meters, which were made and/or especially adapted for use in the Liberty Meters;

d.      The Liberty Meters and components thereof are not staple articles of commerce suitable for substantial non-infringing use with respect to the '310 Patent at least because the Liberty Meters and components thereof have no use apart from  making and/or using the inventions as claimed in the '310 Patent (the parking meters and components thereof are used only in conjunction with or as part of the claimed apparatus of the '310 Patent); and,

e.      CivicSmart sells, has sold, and/or has supplied the Liberty Meters knowing of IPS Group's '310 Patent and knowing that the Liberty Meters incorporate Plaintiff's patented device and/or were specially adapted for use in a way that infringes the '310 Patent.

70.      CivicSmart has contributorily infringed the '310 Patent by providing the Liberty Meters, including at least the Liberty Meters to their customers, resellers, and end-users who in turn make, use, sell, offer to sell, or import the parking meter claimed in the '310 Patent as alleged above and that incorporates the Liberty Meter as a component.  Further, components of the Liberty Meters themselves, including but not limited to spare parts, are known by CivicSmart to be especially made or specially adapted for use in infringement of the claims of the '310 Patent, as alleged above.  These components constitute a material part of the inventions covered by the '310 Patent because they can only be used in connection with the Liberty Meters, and the Liberty Meters themselves (as made and as used) infringe the '310 Patent.  Additionally, these components, as well as the Liberty

1   Meters themselves, are not staple articles or commodities suitable for substantial

2   non-infringing use because they are fundamental to and designed specifically to

3   provide functionality for the parking meter devices that infringe the '310 Patent.

4        71.    Unless enjoined by this Court, CivicSmart will continue to infringe

5   the '310 Patent, and IPS Group will continue to suffer irreparable harm for which

6   there is no adequate remedy at law.  Accordingly, IPS Group is entitled to

7   preliminary and/or permanent relief against such infringement pursuant to 35

8   U.S.C. § 283.

9        72.    As a result of CivicSmart's infringement of the '310 Patent, IPS

10  Group has been and continues to be irreparably injured in its business and property

11  rights, and is entitled to recover damages for such injuries pursuant to 35 U.S.C. §

12  284 in an amount to be determined at trial.

13       73.    IPS Group is informed and believes, and on the basis of such

14  information and belief, alleges that CivicSmart's infringement of the '  310 Patent

15  is willful and deliberate.  CivicSmart has had actual knowledge of the '310 Patent

16  since before the filing of this Complaint, yet continues to infringe this patent to this

17  very day.  As a result of CivicSmart's intentional actions, the infringement of the

18  '310 Patent is willful and deliberate, entitling IPS Group to enhanced damages

19  pursuant to 35 U.S.C. § 284 and to an award of attorney's fees and costs incurred

20  in prosecuting this action pursuant to 35 U.S.C. § 285.

21

## THIRD CAUSE OF ACTION

### (Patent Infringement by all Defendants of U.S. Patent No. 8,513,832)

74.     IPS Group repeats and realleges the allegations of the foregoing paragraphs of this Complaint as though fully set forth herein.

75.     Each Defendant, either individually or collectively, directly infringes at least Claim 1 of the '832 Patent pursuant to 35 U.S.C. § 271(a).  Each Defendant, either individually or collectively, makes, uses, sells, offers to sell, and/or imports Liberty Meters into the United States without permission from IPS Group.

76.     Claim 1 is recited here as a representative claim for exemplary purposes only.  IPS Group intends to allege additional claims of the '832 Patent and will do so in accordance with the Court's local rules and procedures.

77.     On information and belief, each Defendant is aware of its respective infringing acts.  Each Defendant is also aware that by extension its respective customers, resellers, and end-users make and/or use the Liberty Meters in an infringing manner.  Each Defendant encourages its respective customers, resellers, and end-users to make and/or use the Liberty Meters in an infringing manner as set forth in the preceding Paragraphs.

78.     In particular, when a Liberty Meter is placed into operation and installed at a specific parking space, use of that Liberty Meter is the only way by which an end-user may utilize the specific parking space.  Each such use of the

Liberty Meter—*i.e.* each act of paying the parking meter either by coin, credit card, or alternative method—constitutes a separate act of direct infringement of the claims of the '832 Patent.

79.    Additional examples of Each Defendant's actions taken to induce its respective customers, resellers, and end-users include: offering ongoing training regarding the Liberty Meters; selling or offering to sell spare parts for the Liberty Meters; providing installation, training, and ongoing support regarding the use and installation of the Liberty Meters (which includes using the Liberty Meters in an infringing manner); and offering various "tag along" products and services that use or are used in connection with the Liberty Meters.

80.    On information and belief, each Defendant—individually or collectively—without authority has induced and continues to induce infringement of the '832 Patent in violation of 35 U.S.C. § 271(b) inasmuch as:

       a.     The Liberty Meter's normal use by Defendants' respective customers, resellers, and/or end-users infringe one or more claims of the '832 Patent;

       b.     Each Defendant has known and has been continuously aware of the '832 Patent since before the filing of this action, as discussed above;

       c.     Each Defendant has acted in a manner that encourages and continues to encourage others to infringe the '832 Patent by, among other things, intentionally directing, instructing, or encouraging customers or end-users to use

1  the Liberty Meters in a manner that each Defendant knows or should have known

2  would cause its respective customers or end-users to infringe the '832 Patent;

3            d.        Each Defendant, individually or collectively, sells, distributes,

4  and supplies the Liberty Meters to customers and end-users with the intent that the

5  products be used in an infringing manner;

6            e.        Each Defendant provides the services and products identified

7  above designed to instruct, encourage, and direct customers and end-users to use

8  the products in an infringing manner; and,

9            f.        Each Defendant advertises, markets, and promotes the use of

10  the Liberty Meters in an infringing manner.

11       81.    As alleged above, incorporated herewith, and based upon information

12  and belief, Plaintiff alleges that each Defendant, individually or collectively, has

13  contributed and continues to contribute to the infringement of at least Claim 1 of

14  the '832 Patent in violation of 35 U.S.C. § 271(c) inasmuch as:

15            a.        Liberty Meters infringe the '832 Patent during their normal use

16  by Each Defendant's respective customers, resellers, and end users within the

17  United States;

18            b.        Each Defendant has known and has been continuously aware of

19  the '832 Patent since before the filing of this action, as discussed above;

20            c.        Each Defendant makes, uses, imports into the United States,

21  sells and/or offers to sell within the United States the Liberty Meters and

1    components thereof (including but not limited to various spare parts to be used in

2    the Liberty Meters and/or services related to the Liberty Meters) that (a) practice

3    the claims of the '832 Patent; and, (b) each Defendant knows constitutes material

4    infringing component(s) of the Liberty Meters, which were made and/or especially

5    adapted for use in the Liberty Meters;

6         d.    The Liberty Meters and components thereof are not staple

7    articles of commerce suitable for substantial non-infringing use with respect to the

8    '832 Patent at least because the Liberty Meters and components thereof may be

9    used only in conjunction with or as part of the claimed apparatus of the '832 Patent

10   have no use apart from  making and/or using the inventions as claimed in the '832

11   Patent (the parking meters and components thereof are used only in conjunction

12   with or as part of the claimed apparatus of the '832 Patent); and,

13        e.    Each Defendant, individually or collectively, sells, has sold,

14   and/or has supplied the Liberty Meters (or components thereof) knowing of IPS

15   Group's '832 Patent and knowing that the Liberty Meters incorporate Plaintiff's

16   patented device and/or were specially adapted for use in a way that infringes the

17   '832 Patent.

18        82.   Each Defendant, individually or collectively, has contributorily

19   infringed the '832 Patent by providing Liberty Meters or components thereof to its

20   respective customers, resellers, and end-users who in turn make, use, sell, offer to

21   sell, or import the parking meter claimed in the '832 Patent as alleged above and

1    that incorporates such meters or components.  Further, components of the Liberty

2    Meters themselves, including but not limited to spare parts, are known by

3    CivicSmart to be especially made or specially adapted for use in infringement of

4    the claims of the '832 Patent, as alleged above.  These components constitute a

5    material part of the inventions covered by the '832 Patent because they can only be

6    used in connection with the Liberty Meters, and the Liberty Meters themselves (as

7    made and as used) infringe the '832 Patent.  Additionally, these components, as

8    well as the Liberty Meters themselves, are not staple articles or commodities

9    suitable for substantial, non-infringing use because they are fundamental to and

10   designed specifically to provide functionality for the parking meter devices that

11   infringe the '832 Patent.

12       83.    Unless enjoined by this Court, each Defendant will continue to

13   infringe the '832 Patent, and IPS Group will continue to suffer irreparable harm for

14   which there is no adequate remedy at law.  Accordingly, IPS Group is entitled to

15   preliminary and/or permanent relief against such infringement pursuant to 35

16   U.S.C. § 283.

17       84.    As a result of each Defendant's individual or collective infringement

18   of the '832 Patent, IPS Group has been and continues to be irreparably injured in

19   its business and property rights, and is entitled to recover damages from each

20   Defendant jointly and severally for such injuries pursuant to 35 U.S.C. § 284 in an

21   amount to be determined at trial.

85.     IPS Group is informed and believes, and on the basis of such information and belief, alleges that each Defendant's infringement of the '832 Patent is willful and deliberate.  Each Defendant has had actual knowledge of the '832 Patent since before the filing of this Complaint, yet continues to infringe this patent to this very day.  As a result of each Defendant's intentional actions, the infringement of the '832 Patent is willful and deliberate, entitling IPS Group to enhanced damages pursuant to 35 U.S.C. § 284 and to an award of attorney's fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

## **FOURTH CAUSE OF ACTION**

### **(Patent Infringement by all Defendants of U.S. Patent No. 8,749,403)**

86.     IPS Group repeats and realleges the allegations of the foregoing paragraphs of this Complaint as though fully set forth herein.

87.     Each Defendant, either individually or collectively, directly infringes at least Claim 1 of the '403 Patent pursuant to 35 U.S.C. § 271(a).  Each Defendant, either individually or collectively, makes, uses, sells, offers to sell, and/or imports Liberty Meters into the United States without permission from IPS Group.

88.     Claim 1 is recited here as a representative claim for exemplary purposes only.  IPS Group intends to allege additional claims of the '403 Patent and will do so in accordance with the Court's local rules and procedures.

89.     On information and belief, each Defendant is aware of its respective infringing acts.  Each Defendant is also aware that by extension its respective customers, resellers, and end-users make and/or use the Liberty Meters in an infringing manner.  Each Defendant encourages its respective customers, resellers, and end-users to make and/or use the Liberty Meters in an infringing manner as set forth in the preceding Paragraphs.

90.     In particular, when a Liberty Meter is placed into operation and installed at a specific parking space, use of that Liberty Meter is the only way by which an end user may utilize the specific parking space.  Each such use of the Liberty Meter—*i.e.* each act of paying the parking meter either by coin, credit card, or alternative method—constitutes a separate act of direct infringement of the claims of the '403 Patent.

91.     Additional examples of each Defendant's actions taken to induce its respective customers, resellers, and end-users include: offering ongoing training regarding the Liberty Meters; selling or offering to sell spare parts regarding the Liberty Meters; providing installation, training, and ongoing support regarding the use and installation of the Liberty Meters (which includes using the Liberty Meters in an infringing manner); and offering various "tag along" products and services that use or are used in connection with the Liberty Meters.

92.     On information and belief, each Defendant—individually or collectively—without authority has induced and continues to induce infringement of the '403 Patent in violation of 35 U.S.C. § 271(b) inasmuch as:

a.     The Liberty Meter's normal use by Defendants' respective customers, resellers, and/or end-users infringe one or more claims of the '403 Patent;

b.     Each Defendant has known and has been continuously aware of the '403 Patent since before the filing of this action, as discussed above;

c.     Each Defendant has acted in a manner that encourages and continues to encourage others to infringe the '403 Patent by, among other things, intentionally directing, instructing, or encouraging customers or end-users to use the Liberty Meters in a manner that each Defendant knows or should have known would cause its respective customers or end-users to infringe the '403 Patent;

d.     Each Defendant, individually or collectively, sells, distributes, and supplies the Liberty Meters to customers and end-users with the intent that the products be used in an infringing manner;

e.     Each Defendant provides the services and products identified above designed to instruct, encourage, and direct customers and end-users to use the products in an infringing manner; and,

f.     Each Defendant advertises, markets, and promotes the use of the Liberty Meters in an infringing manner.

93.    As alleged above, incorporated herewith, and based upon information and belief, Plaintiff alleges that each Defendant, individually or collectively, has contributed and continues to contribute to the infringement of at least Claim 1 of the '403 Patent in violation of 35 U.S.C. § 271(c) inasmuch as:

a.    Liberty Meters infringe the '403 Patent during their normal use by Each Defendant's respective customers, resellers, and end users within the United States;

b.    Each Defendant has known and has been continuously aware of the '403 Patent since before the filing of this action, as discussed above;

c.    Each Defendant makes, uses, imports into the United States, sells and/or offers to sell within the United States the Liberty Meters and components thereof (including but not limited to various spare parts to be used in the Liberty Meters and/or services related to the Liberty Meters) that (a) practice the claims of the '403 Patent; and, (b) each Defendant knows constitutes material infringing component(s) of the Liberty Meters, which were made and/or especially adapted for use in the Liberty Meters;

d.    The Liberty Meters and components thereof are not staple articles of commerce suitable for substantial non-infringing use with respect to the '403 Patent at least because the Liberty Meters and components thereof have no use apart from  making and/or using the inventions as claimed in the '403 Patent

1   (the parking meters and components thereof are used only in conjunction with or as

2   part of the claimed apparatus of the '403 Patent); and,

3            e.      Each Defendant, individually or collectively, sells, has sold,

4   and/or has supplied the Liberty Meters (or components thereof) knowing of IPS

5   Group's '403 Patent and knowing that the Liberty Meters incorporate Plaintiff's

6   patented device and/or were specially adapted for use in a way that infringes the

7   '403 Patent.

8            94.    Each Defendant, individually or collectively, has contributorily

9   infringed the '403 Patent by providing Liberty Meters or components thereof to its

10  respective customers, resellers, and end-users who in turn make, use, sell, offer to

11  sell, or import the parking meter claimed in the '403 Patent as alleged above and

12  that incorporates such meters or components.  Further, components of the Liberty

13  Meters themselves, including but not limited to spare parts, are known by each

14  Defendant to be especially made or specially adapted for use in infringement of the

15  claims of the '403 Patent, as alleged above.  These components constitute a

16  material part of the inventions covered by the '403 Patent because they can only be

17  used in connection with the Liberty Meters, and the Liberty Meters themselves (as

18  made and as used) infringe the '403 Patent.  Additionally, these components, as

19  well as the Liberty Meters themselves, are not staple articles or commodities

20  suitable for substantial non-infringing use because they are fundamental to and

21

1   designed specifically to provide functionality for the parking meter devices that

2   infringe the '403 Patent.

3        95.    Unless enjoined by this Court, each Defendant will continue to

4   infringe the '403 Patent, and IPS Group will continue to suffer irreparable harm for

5   which there is no adequate remedy at law.  Accordingly, IPS Group is entitled to

6   preliminary and/or permanent relief against such infringement pursuant to 35

7   U.S.C. § 283.

8        96.    As a result of each Defendant's individual or collective infringement

9   of the '403 Patent, IPS Group has been and continues to be irreparably injured in

10  its business and property rights, and is entitled to recover damages from each

11  Defendant jointly and severally for such injuries pursuant to 35 U.S.C. § 284 in an

12  amount to be determined at trial.

13       97.    IPS Group is informed and believes and, on the basis of such

14  information and belief, alleges that each Defendant's infringement of the ' 403

15  Patent is willful and deliberate.  Each Defendant has had actual knowledge of the

16  '403 Patent since before the filing of this Complaint, yet continues to infringe this

17  patent to this very day.  As a result of each Defendant's intentional actions, the

18  infringement of the '403 Patent is willful and deliberate, entitling IPS Group to

19  enhanced damages pursuant to 35 U.S.C. § 284 and to an award of attorney's fees

20  and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

21

**FIFTH CAUSE OF ACTION**

**(Patent Infringement by all Defendants of U.S. Patent No. 9,391,474)**

98.     IPS Group repeats and realleges the allegations of the foregoing paragraphs of this Complaint as though fully set forth herein.

99.     Each Defendant, either individually or collectively, directly infringes at least Claim 18 of the '474 Patent pursuant to 35 U.S.C. § 271(a).  Each Defendant, either individually or collectively, makes, uses, sells, offers to sell, and/or imports Liberty Meters into the United States without permission from IPS Group.

100.   Claim 18 is recited here as a representative claim for exemplary purposes only.  IPS Group intends to allege additional claims of the '474 Patent and will do so in accordance with the Court's local rules and procedures.

101.   On information and belief, each Defendant is aware of its respective infringing acts.  Each Defendant is also aware that by extension its respective customers, resellers, and end-users make and/or use the Liberty Meters in an infringing manner.  Each Defendant encourages its respective customers, resellers, and end-users to make and/or use the Liberty Meters in an infringing manner as set forth in the preceding Paragraphs.

102.   In particular, when a Liberty Meter is placed into operation and installed at a specific parking space, use of that Liberty Meter is the only way by which an end-user may utilize the specific parking space.  Each such use of the

Liberty Meter—*i.e.* each act of paying the parking meter either by coin, credit card, or alternative method—constitutes a separate act of direct infringement of the claims of the '474 Patent.

103.    Additional examples of each Defendant's actions taken to induce its respective customers, resellers, and end-users include: offering ongoing training regarding the Liberty Meters; selling or offering to sell spare parts regarding the Liberty Meters; providing installation, training, and ongoing support regarding the use and installation of the Liberty Meters (which includes using the Liberty Meters in an infringing manner); and offering various "tag along" products and services that use or are used in connection with the Liberty Meters.

104.    On information and belief, each Defendant—individually or collectively—without authority has induced and continues to induce infringement of the '474 Patent in violation of 35 U.S.C. § 271(b) inasmuch as:

a.    The Liberty Meter's normal use by Defendants' respective customers, resellers, and/or end-users infringe one or more claims of the '474 Patent;

b.    Each Defendant has known and has been continuously aware of the '474 Patent since before the filing of this action, as discussed above;

c.    Each Defendant has acted in a manner that encourages and continues to encourage others to infringe the '474 Patent by, among other things, intentionally directing, instructing, or encouraging customers or end-users to use

1   the Liberty Meters in a manner that each Defendant knows or should have known

2   would cause its respective customers or end-users to infringe the '474 Patent;

3          d.      Each Defendant, individually or collectively, sells, distributes,

4   and supplies the Liberty Meters to customers and end-users with the intent that the

5   products be used in an infringing manner;

6          e.      Each Defendant provides the services and products identified

7   above designed to instruct, encourage, and direct customers and end-users to use

8   the products in an infringing manner; and,

9          f.      Each Defendant advertises, markets, and promotes the use of

10  the Liberty Meters in an infringing manner.

11         105.    As alleged above, incorporated herewith, and based upon information

12  and belief, Plaintiff alleges that each Defendant, individually or collectively, has

13  contributed and continues to contribute to the infringement of at least Claim 18 of

14  the '474 Patent in violation of 35 U.S.C. § 271(c) inasmuch as:

15         a.      Liberty Meters infringe the '474 Patent during their normal use

16  by Each Defendant's respective customers, resellers, and end users within the

17  United States;

18         b.      Each Defendant has known and has been continuously aware of

19  the '474 Patent since before the filing of this action, as discussed above;

20         c.      Each Defendant makes, uses, imports into the United States,

21  sells and/or offers to sell within the United States the Liberty Meters and

1   components thereof (including but not limited to various spare parts to be used in

2   the Liberty Meters and/or services related to the Liberty Meters) that (a) practice

3   the claims of the '474 Patent; and, (b) each Defendant knows constitutes material

4   infringing component(s) of the Liberty Meters, which were made and/or especially

5   adapted for use in the Liberty Meters;

6          d.      The Liberty Meters and components thereof are not staple

7   articles of commerce suitable for substantial non-infringing use with respect to the

8   '474 Patent at least because the Liberty Meters and components thereof have no

9   use apart from  making and/or using the inventions as claimed in the '474 Patent

10  (the parking meters and components thereof are used only in conjunction with or as

11  part of the claimed apparatus of the '474 Patent); and,

12         e.      Each Defendant, individually or collectively, sells, has sold,

13  and/or has supplied the Liberty Meters (or components thereof) knowing of IPS

14  Group's '474 Patent and knowing that the Liberty Meters incorporate Plaintiff's

15  patented device and/or were specially adapted for use in a way that infringes the

16  '474 Patent.

17        106.   Each Defendant, individually or collectively, has contributorily

18  infringed the '474 Patent by providing Liberty Meters or components thereof to its

19  respective customers, resellers, and end-users who in turn make, use, sell, offer to

20  sell, or import the parking meter claimed in the '474 Patent as alleged above and

21  that incorporates such meters or components.  Further, components of the Liberty

1   Meters themselves, including but not limited to spare parts, are known by each

2   Defendant to be especially made or specially adapted for use in infringement of the

3   claims of the '474 Patent, as alleged above.  These components constitute a

4   material part of the inventions covered by the '474 Patent because they can only be

5   used in connection with the Liberty Meters, and the Liberty Meters themselves (as

6   made and as used) infringe the '474 Patent.  Additionally, these components, as

7   well as the Liberty Meters themselves, are not staple articles or commodities

8   suitable for substantial non-infringing use because they are fundamental to and

9   designed specifically to provide functionality for the parking meter devices that

10   infringe the '474 Patent.

11       107.   Unless enjoined by this Court, each Defendant will continue to

12   infringe the '474 Patent, and IPS Group will continue to suffer irreparable harm for

13   which there is no adequate remedy at law.  Accordingly, IPS Group is entitled to

14   preliminary and/or permanent relief against such infringement pursuant to 35

15   U.S.C. § 283.

16       108.   As a result of each Defendant's individual or collective infringement

17   of the '474 Patent, IPS Group has been and continues to be irreparably injured in

18   its business and property rights, and is entitled to recover damages from each

19   Defendant jointly and severally for such injuries pursuant to 35 U.S.C. § 284 in an

20   amount to be determined at trial.

21

109.   IPS Group is informed and believes and, on the basis of such information and belief, alleges that each Defendant's infringement of the '474 Patent is willful and deliberate.  Each Defendant has had actual knowledge of the '474 Patent since before the filing of this Complaint, yet continues to infringe this patent to this very day.  As a result of each Defendant's intentional actions, the infringement of the '474 Patent is willful and deliberate, entitling IPS Group to enhanced damages pursuant to 35 U.S.C. § 284 and to an award of attorney's fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

## SIXTH CAUSE OF ACTION

### (Patent Infringement by all Defendants of U.S. Patent No. 9,424,691)

110.   IPS Group repeats and realleges the allegations of the foregoing paragraphs of this Complaint as though fully set forth herein.

111.   Each Defendant, either individually or collectively, directly infringes at least Claim 1 of the '691 Patent pursuant to 35 U.S.C. § 271(a).  Each Defendant, either individually or collectively, makes, uses, sells, offers to sell, and/or imports Liberty Meters into the United States without permission from IPS Group.

112.   Claim 1 is recited here as a representative claim for exemplary purposes only.  IPS Group intends to allege additional claims of the '691 Patent and will do so in accordance with the Court's local rules and procedures.

113.   On information and belief, each Defendant is aware of its respective infringing acts.  Each Defendant is also aware that by extension its respective customers, resellers, and end-users make and/or use the Liberty Meters in an infringing manner.  Each Defendant encourages its respective customers, resellers, and end-users to make and/or use the Liberty Meters in an infringing manner as set forth in the preceding Paragraphs.

114.   In particular, when a Liberty Meter is placed into operation and installed at a specific parking space, use of that Liberty Meter is the only way by which an end-user may utilize the specific parking space.  Each such use of the Liberty Meter—*i.e.* each act of paying the parking meter either by coin, credit card, or alternative method—constitutes a separate act of direct infringement of the claims of the '691 Patent.

115.   Additional examples of each Defendant's actions taken to induce its respective customers, resellers, and end-users include: offering ongoing training regarding the Liberty Meters; selling or offering to sell spare parts regarding the Liberty Meters; providing installation, training, and ongoing support regarding the use and installation of the Liberty Meters (which includes using the Liberty Meters in an infringing manner); and offering various "tag along" products and services that use or are used in connection with the Liberty Meters.

116.   On information and belief, each Defendant—individually or collectively—without authority has induced and continues to induce infringement of the '691 Patent in violation of 35 U.S.C. § 271(b) inasmuch as:

a.      The Liberty Meter's normal use by Defendants' respective customers, resellers, and/or end-users infringe one or more claims of the '691 Patent;

b.      Each Defendant has known and has been continuously aware of the '691 Patent since before the filing of this action, as discussed above;

c.      Each Defendant has acted in a manner that encourages and continues to encourage others to infringe the '691 Patent by, among other things, intentionally directing, instructing, or encouraging customers or end-users to use the Liberty Meters in a manner that each Defendant knows or should have known would cause its respective customers or end-users to infringe the '691 Patent;

d.      Each Defendant, individually or collectively, sells, distributes, and supplies the Liberty Meters to customers and end-users with the intent that the products be used in an infringing manner;

e.      Each Defendant provides the services and products identified above designed to instruct, encourage, and direct customers and end-users to use the products in an infringing manner; and,

f.      Each Defendant advertises, markets, and promotes the use of the Liberty Meters in an infringing manner.

117.   As alleged above, incorporated herewith, and based upon information and belief, Plaintiff alleges that each Defendant, individually or collectively, has contributed and continues to contribute to the infringement of at least Claim 18 of the '691 Patent in violation of 35 U.S.C. § 271(c) inasmuch as:

a.   Liberty Meters infringe the '691 Patent during their normal use by each Defendant's respective customers, resellers, and end users within the United States;

b.   Each Defendant has known and has been continuously aware of the '691 Patent since before the filing of this action, as discussed above;

c.   Each Defendant makes, uses, imports into the United States, sells and/or offers to sell within the United States the Liberty Meters and components thereof (including but not limited to various spare parts to be used in the Liberty Meters and/or services related to the Liberty Meters) that (a) practice the claims of the '691 Patent; and, (b) each Defendant knows constitutes material infringing component(s) of the Liberty Meters, which were made and/or especially adapted for use in the Liberty Meters;

d.   The Liberty Meters and components thereof are not staple articles of commerce suitable for substantial non-infringing use with respect to the '691 Patent at least because the Liberty Meters and components thereof have no use apart from  making and/or using the inventions as claimed in the '691 Patent

1  (the parking meters and components thereof are used only in conjunction with or as

2  part of the claimed apparatus of the '691 Patent); and,

3              e.      Each Defendant, individually or collectively, sells, has sold,

4  and/or has supplied the Liberty Meters (or components thereof) knowing of IPS

5  Group's '691 Patent and knowing that the Liberty Meters incorporate Plaintiff's

6  patented device and/or were specially adapted for use in a way that infringes the

7  '691 Patent.

8              118.   Each Defendant, individually or collectively, has contributorily

9  infringed the '691 Patent by providing Liberty Meters or components thereof to its

10  respective customers, resellers, and end-users who in turn make, use, sell, offer to

11  sell, or import the parking meter claimed in the '691 Patent as alleged above and

12  that incorporates such meters or components.  Further, components of the Liberty

13  Meters themselves, including but not limited to spare parts, are known by each

14  Defendant to be especially made or specially adapted for use in infringement of the

15  claims of the '691 Patent, as alleged above.  These components constitute a

16  material part of the inventions covered by the '691 Patent because they can only be

17  used in connection with the Liberty Meters, and the Liberty Meters themselves (as

18  made and as used) infringe the '691 Patent.  Additionally, these components, as

19  well as the Liberty Meters themselves, are not staple articles or commodities

20  suitable for substantial non-infringing use because they are fundamental to and

21

1  designed specifically to provide functionality for the parking meter devices that

2  infringe the '691 Patent.

3       119.   Unless enjoined by this Court, each Defendant will continue to

4  infringe the '691 Patent and IPS Group will continue to suffer irreparable harm for

5  which there is no adequate remedy at law.  Accordingly, IPS Group is entitled to

6  preliminary and/or permanent relief against such infringement pursuant to 35

7  U.S.C. § 283.

8       120.   As a result of each Defendant's individual or collective infringement

9  of the '691 Patent, IPS Group has been and continues to be irreparably injured in

10  its business and property rights, and is entitled to recover damages from each

11  Defendant jointly and severally for such injuries pursuant to 35 U.S.C. § 284 in an

12  amount to be determined at trial.

13       121.   IPS Group is informed and believes and, on the basis of such

14  information and belief, alleges that each Defendant's infringement of the '691

15  Patent is willful and deliberate.  Each Defendant has had actual knowledge of the

16  '691 Patent since before the filing of this Complaint, yet continues to infringe this

17  patent to this very day.  As a result of each Defendant's intentional actions, the

18  infringement of the '691 Patent is willful and deliberate, entitling IPS Group to

19  enhanced damages pursuant to 35 U.S.C. § 284 and to an award of attorney's fees

20  and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

21

# SEVENTH CAUSE OF ACTION

## (Violation By CivicSmart and Duncan Parking Technologies of False Advertising Law Bus. & Prof. Code §§ 17500, et. seq.)

122.   IPS Group repeats and re-alleges the allegations of the foregoing paragraphs of this Complaint as though fully set forth herein.

123.   California's False Advertising Law (Bus. & Prof. Code §§ 17500, *et seq.*) makes it unlawful for any person to "induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state … in any newspaper or other publication, or any advertising device… any statement… concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading…"

124.   On information and belief, CivicSmart and DPT made and disseminated to members of the public in this state, including various city governments, untrue and misleading statements about IPS Group and IPS Group's patent portfolio, and statements IPS Group allegedly made in the course of litigation between the parties.

125.   Through these untrue and misleading statements, CivicSmart and DPT induced and/or attempted to induce municipalities in this state to purchase its Liberty Meter instead of IPS Group's meters.  Among other statements,

CivicSmart and DPT falsely claim that IPS Group admitted that the Liberty Meter, without a solar panel, would not infringe any of IPS Group's patents.

126.   The effect of these false statements equates to deception of a municipal government, potentially resulting in the supply of infringing products, which can be subject to removal by Court order upon a finding of infringement. This would thereby cause the city and its citizens substantial waste in taxpayer money, and create further costly remedial measures to replace the Liberty Meters.

127.   Defendants knew or should have known, through the exercise of reasonable care that their statements were untrue and misleading.

128.   Defendants' actions in violation of § 17500 were false and misleading such that the potential customers of IPS Group were and are likely to be deceived.

129.   As a direct and proximate result of these acts, IPS Group has suffered injury in fact, lost monetary opportunities, and will continue to lose monetary opportunities as long as such false statement continue to be made and disseminated to potential customers.

130.   IPS Group brings this action pursuant to § 17535 for injunctive relief to enjoin the practices described herein.

## **EIGHTH CAUSE OF ACTION**

### **(Violation by CivicSmart and Duncan Parking Technologies of Unfair Competition Law Bus. & Prof. Code §§ 17200, et. seq.)**

131.   IPS Group repeats and realleges the allegations of the foregoing paragraphs of this Complaint as though fully set forth herein.

132.   California's Unfair Competition Law ("UCL") (Bus. & Prof. Code §§ 17200, *et. seq.*) prohibits acts of unfair competition, which include any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

133.   By their actions described above, CivicSmart and DPT violated and continue to violate the UCL in that they have engaged and continue to engage in unfair business practices within the meaning of the UCL.

134.   CivicSmart and DPT have engaged in "unfair" business practice by publishing false information about IPS Group's intellectual property protections, including the scope of patents owned by IPS Group, and false information about statements IPS Group made during litigation between the parties.  On information and belief, potential customers relied and will rely on the false information in granting CivicSmart/DPT bids to purchase their products over other competitors, including IPS Group, and other business opportunities (such as opportunities to trial the infringing Liberty meter within the various municipalities).

135.   As a direct and proximate result of these acts, IPS Group has suffered injury in fact and has lost monetary opportunities.

136.   IPS Group seeks an order and/or judgment from the Court to enjoin CivicSmart and DPT from engaging in practices which constitute unfair competition, and to order CivicSmart and DPT to issue corrective any city to which CivicSmart and DPT have made false statements and recanting those false

statements regarding the current or future state of infringement as it relates to IPS Group patents.

## NINTH CAUSE OF ACTION

### (Violation by CivicSmart and Duncan Parking Technologies of Federal Unfair Competition Law, 15 U.S.C. § 1125(a), Lanham Act § 43(a))

137.   IPS Group repeats and realleges the allegations of the foregoing paragraphs of this Complaint as though fully set forth herein.

138.   The conduct of CivicSmart and DPT is likely to cause confusion, to cause mistake, or to deceive customers as to the scope of IPS Group's intellectual property rights and scope of its patents. CivicSmart's and DPT's false statements relating to the alleged noninfringement of IPS Group's patents would also cause customers, such as the City of Milwaukee, to accept CivicSmart's and DPT's proposals and bids based on the false representation of CivicSmart's and DPT's financial stability and deceptive assurances of their products' noninfringement of IPS Group's patents. CivicSmart's and DPT's false statements attempt to hide the high risk of significant financial liability resulting from legal actions instituted against CivicSmart and DPT, thereby exposing the city and the community to egregious and intentionally concealed risk of economic waste of taxpayer money and government resources .

139.   The conduct of CivicSmart and DPT constitutes unfair competition, false advertising, false representation of fact, and false description in violation of § 43 (a) of the Langham Act, 15 U.S.C. § 1125(a).

140.   Because CivicSmart and DPT are promoting false assurances about Liberty Meter's noninfringement of all IPS Group-owned patents solely by the omission of the solar panel feature, CivicSmart and DPT have caused and are causing substantial irreparable harm to IPS Group by mischaracterizing the scope of IPS Group's intellectual property rights and patent protection.  CivicSmart and DPT will continue to damage IPS Group and to deceive customers, various municipal governments, and the public unless enjoined by this Court.

141.   IPS Group has no adequate remedy at law to address the continued harm to its reputation caused by Defendants' conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff IPS Group requests entry of judgment in its favor and against Defendants as follows:

a.      Declaring that DPT and DSI were formerly alter egos of one another;

b.      Declaring the DPT and CivicSmart are presently alter egos of one another;

c.      Declaring that the '054, '310, '832, '403, '474, and '691 Patents are valid and enforceable;

d.      That CivicSmart has infringed one or more claims of the '054 and '310 Patents;

e.      That each Defendant has infringed one or more claims of the '832, '403, '474, and '691 Patents;

f.      That each Defendant's infringement has been willful;

g.      That Defendants' liability for infringement is joint and several;

h.      Preliminarily and/or permanently enjoining each Defendant, their officers, partners, employees, agents, parents, subsidiaries, attorneys, and anyone acting in concert or participation with any of them, from further infringement, in accordance with 35 U.S.C. § 283;

i.      Awarding IPS Group damages in an amount adequate to compensate IPS Group for each Defendant's respective infringement, in accordance with 35 U.S.C. § 284;

j.      Awarding treble damages and/or exemplary damages for Defendants' respective willful infringement under 35 U.S.C. § 284;

k.      Declaring that this is an exceptional case;

l.      Awarding to IPS Group attorneys' fees and costs incurred by IPS Group in connection with this action under 35 U.S.C. § 285; and

m.      Ordering CivicSmart and DPT to submit corrective statements to the City of Milwaukee, Wisconsin and any other city to which Defendants have made or disseminated the false statement, recanting any false statements made regarding the current or future state of infringement as it relates to IPS Group patents.

n.      Enjoining CivicSmart and DPT from submitting any future responses to requests for parking meters that includes any false statements made regarding the current or future state of infringement as it relates to IPS Group patents.

1    o.    Granting such other and further relief as this Court may deem just and

2  appropriate.

3  Dated:  May 26, 2017              WILSON SONSINI GOODRICH & ROSATI
                                     Professional Corporation
4

5                                    By:  ___/s/ Douglas Carsten_____
                                          Douglas Carsten
6
                                     Attorney for Plaintiff IPS Group, Inc.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1

## DEMAND FOR JURY TRIAL

2

3

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff IPS Group, Inc. demands a trial by jury of this action.

4

Dated: May 26, 2017

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

5

6

By: ___s/ Douglas Carsten___
Douglas Carsten

7

Attorney for Plaintiff IPS Group, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1

# **TABLE OF EXHIBITS**

2

| Exhibit | Page(s) |
|---------|---------|
| 1 | 56-64 |
| 2 | 65-73 |
| 3 | 74-87 |
| 4 | 88-107 |
| 5 | 108-118 |
| 6 | 119-139 |
| 7 | 140-239 |
| 8 | 240-313 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that the foregoing document was filed with the Court's

3

CM/ECF system which will provide notice on all counsel deemed to have

4

consented to electronic service. All other counsel of record not deemed to have

5

consented to electronic service were served with a true and correct copy of the

6

foregoing document by mail on this day.

7

8

Dated: May 26, 2017            Respectfully submitted,
                               WILSON SONSINI GOODRICH & ROSATI

9

                               Professional Corporation

10

                               By:  */s/ Douglas Carsten*

11

                                    Douglas Carsten

12

                               Attorneys for Plaintiff IPS Group, Inc.

13

14

15

16

17

18

19

20

21